IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Odenthia Sherell Dozier, | ) | C/A No.: 1:14-29-DCN-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claims for Disability Insurance Benefits ("DIB"), Disabled Widow's Insurance Benefits ("DWIB"), and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.      Relevant Background

A.      Procedural History

On September 3, 2010, Plaintiff filed applications for DIB, DWB, and SSI in which she alleged her disability began on May 19, 2010. Tr. at 128–34, 155–57; ECF No.

15-1. Her applications were denied initially and upon reconsideration. Tr. at 72–73, 76–79, 80–81, 82–83. On July 17, 2012, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Marcus Christ. Tr. at 27–42 (Hr'g Tr.). The ALJ issued an unfavorable decision on July 27, 2012, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 9–22. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–4. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on January 3, 2014. [ECF No. 1].

  B.  Plaintiff's Background and Medical History

    1.  Background

Plaintiff was 51 years old at the time of the hearing. Tr. at 43. She completed the eleventh grade. Tr. at 172. Her past relevant work ("PRW") was as a housekeeper, a dry-cleaner helper, and a cashier. Tr. at 39. She alleges she has been unable to work since May 19, 2010. Tr. at 128.

    2.  Medical History

On October 2, 2009, Plaintiff followed up at the Digestive Disease Center at Medical University of South Carolina ("MUSC") for irritable bowel syndrome ("IBS"). Tr. at 240. She complained of intermittent periumbilical and lower quadrant pain over the prior two-week period. *Id.* She reported her bowels were reasonably regulated with fiber, hemorrhoids were less symptomatic, and rectal bleeding was scant and intermittent. *Id.* Andrew Brock, M.D. ("Dr. Brock"), indicated that Plaintiff had had undergone multiple,

unrevealing tests that included esophagogastroduodenoscopy ("EGD"), colonoscopy, abdominal CT, pelvic CT, and gastric emptying scan ("GES"). *Id.* Dr. Brock renewed Plaintiff's prescription for Bentyl and prescribed Desipramine 30 mg nightly. Tr. at 241. He stated that a "lack of funding had precluded surgical treatment of hemorrhoids." *Id.*

Plaintiff presented to the emergency department ("ED") at MUSC on November 4, 2009, complaining of a cough and left arm pain. Tr. at 237. She was diagnosed with bronchitis. Tr. at 238.

On November 16, 2009, Plaintiff presented to the ED at MUSC with left arm pain. Tr. at 235. The provider observed hyperpigmentation, but indicated it was likely chronic. Tr. at 236. Plaintiff demonstrated no cellulitis or abscess. *Id.*

On January 18, 2010, Plaintiff presented to the ED at Roper Hospital with pain in her left breast. Tr. at 271. The provider observed tenderness and induration/thickening. *Id.* She instructed Plaintiff to follow up with a surgeon. *Id.*

Plaintiff presented to the ED at MUSC on January 19, 2010, with left breast pain. Tr. at 233. The provider observed swelling and a rash and noted a recently-drained abscess. *Id.* Plaintiff's left breast and lymph nodes were tender, but she had no palpable mass. *Id.* An ultrasound of Plaintiff's left breast revealed a subcutaneous cystic lesion, a benign-appearing lymph node within the left axilla, and a smaller lymph node in the long axis. Tr. at 251. Plaintiff's blood pressure was elevated. Tr. at 233. She was prescribed Bactrim and Lortab and instructed to follow up with her primary care physician as soon as possible and to obtain another lymph node ultrasound in six months. Tr. at 234.

Plaintiff followed up at Franklin C. Fetter Family Health Center ("FCFFHC") on January 20, 2010, February 2, 2010, and March 10, 2010. Tr. at 281, 282, 283.

A chest x-ray on March 11, 2010, was normal. Tr. at 246.

On March 13, 2010, Plaintiff presented to the ED at MUSC, complaining of paraspinal pain radiating to her posterior right shoulder. Tr. at 231. She denied upper extremity weakness, paresthesias, and loss of sensation. *Id.* The provider noted mild tenderness to palpation of the right paraspinous of Plaintiff's right shoulder. *Id.* Plaintiff had 5/5 strength in her bilateral upper and lower extremities and no sensory deficit. *Id.* She was diagnosed with a muscle strain and instructed to take Motrin. Tr. at 232.

Plaintiff presented to the ED at MUSC with left axillary lymphadenopathy and a possible breast lump on March 24, 2010. Tr. at 230. The provider noted that Plaintiff had had two ultrasounds and a mammogram at Hollings Cancer Center that indicated normal findings. *Id.* Plaintiff was instructed to follow up with her primary care physician. *Id.* Plaintiff followed up at FCFFHC on March 29, 2010, and April 22, 2010. Tr. at 279, 280.

On April 23, 2010, Plaintiff reported to the ED at Roper Hospital complaining that she awoke with pain from her left hip down her lateral left leg to her mid-calf. Tr. at 262. She demonstrated tenderness over her distal thigh, hamstring, and calf, but had full range of motion of all extremities and no edema. Tr. at 264. Daniel Lewis, M.D., noted that the findings were consistent with a mild to moderate sprain or strain. *Id.*

On June 21, 2010, Plaintiff presented FCFFHC with left flank pain. Tr. at 278. She indicated her left knee gave out. *Id.* Plaintiff's body mass index ("BMI") was greater than 35, and the provider instructed her to lose weight. *Id.*

4

On September 10, 2010, Plaintiff had a mammogram that showed an irregular left axillary lymph node, but no suspicious findings. Tr. at 244. An ultrasound of Plaintiff's left breast revealed no change in the axillary lymph node when compared to the January 2010 ultrasound findings. Tr. at 242. Plaintiff was instructed to follow up with an annual mammogram in January or February 2011. *Id.*

Plaintiff presented to FCFFHC on September 21, 2010, with worsened left knee pain and instability. Tr. at 277. The provider diagnosed osteoarthritis of the left knee. *Id.*

On October 20, 2010, Plaintiff presented to Roper Hospital with an abscess behind her left ear and tenderness and swelling in a left lymph node. Tr. at 258–60. She received an antibiotic and was instructed to follow up with her primary care physician. Tr. at 259.

Plaintiff followed up for left shoulder pain at FCFFHC on December 7, 2010. Tr. at 276. She complained of sleep difficulty and stated she cried all night. *Id.* Plaintiff was in discomfort and had tenderness and decreased range of motion in her left shoulder. *Id.* The provider assessed left shoulder pain, questionable bursitis, and back pain, administered a steroid injection, and prescribed Naprosyn, Loratadine, and Lortab. *Id.*

Plaintiff presented to the ED at Roper Hospital on December 16, 2010, complaining of left breast pain that began a day earlier. Tr. at 347. She was diagnosed with hypertension and left breast pain of unknown etiology. *Id.*

On February 17, 2011, Plaintiff visited Harriet Steinert, M.D., for a comprehensive orthopedic examination. Tr. at 294–98. Plaintiff complained of weakness in her left hand, bilateral carpal tunnel syndrome, neck pain, lumbar spine pain, left knee pain, left calf pain, left leg numbness and swelling, possible breast lump, shortness of

breath with exertion, IBS, high blood pressure accompanied by occasional headache, frequent skin abscesses, and yeast infection. Tr. at 296. Dr. Steinert observed Plaintiff to be 5'1" tall and to weigh 260 pounds. Tr. at 297. Plaintiff's blood pressure was elevated at 168/101. *Id.* Dr. Steinert observed no tenderness to palpation in any of Plaintiff's joints, no swelling, no deformity, and no inflammation. *Id.* Dr. Steinert observed Plaintiff to have normal range of motion of her cervical spine; decreased range of motion of her lumbar spine with flexion reduced from 90 to 45 degrees, extension reduced from 25 to zero degrees, and lateral flexion decreased from 25 to 15 degrees; normal bilateral shoulder range of motion; normal bilateral elbow range of motion; normal bilateral wrist range of motion; left knee flexion reduced from 150 to 90 degrees; normal right knee flexion; normal extension of the bilateral knees; normal range of motion of the hips; normal range of motion of the ankles; negative straight leg-raise in the sitting position bilaterally; positive straight-leg raise at 20 degrees in the supine position on the left; normal range of motion, grip, and fine and gross manipulation of the bilateral hands; normal reflexes; and normal tandem walk. Tr. at 294–95. Plaintiff was unable to perform the heel-toe walk or to squat and she walked with a slight limp. Tr. at 295. Dr. Steinert observed no muscle weakness, sensory loss, joint abnormality, or atrophy and she indicated Plaintiff did not use an assistive device to ambulate. *Id.* An x-ray of Plaintiff's lumbar spine indicated minimal degenerative disc disease from L3-4 through L5-S1. Tr. at 300. An x-ray of her cervical spine indicated degenerative disc disease at C5-6 and C6-7. Tr. at 301. Dr. Steinert diagnosed chronic neck and lumbar spine pain of uncertain

etiology, hypertension, arthritis, stroke, IBS, and chronic obstructive pulmonary disease ("COPD"). Tr. at 297.

State agency medical consultant Jean Smolka, M.D., completed a physical residual functional capacity assessment on March 8, 2011. Tr. at 302–09. She indicated Plaintiff could perform work with the following restrictions: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday; frequently climb ramps/stairs, balance, and crouch; occasionally stoop, kneel, and crawl; never climb ladders/ropes/scaffolds; frequently reach overhead with the bilateral upper extremities; and avoid all exposure to hazards. *Id.*

A mammogram and ultrasounds of Plaintiff's left breast in March 2011 indicated no suspicious findings. Tr. at 312, 313.

On March 21, 2011, Lisa Varner, Ph. D., completed a psychiatric review technique. Tr. at 314–26. She indicated Plaintiff had depression with mild restriction of activities of daily living ("ADLs"), no difficulties in maintaining social functioning, no difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. Tr. at 317, 324.

Plaintiff presented to FCFFHC on June 17, 2011, complaining of swelling in her bilateral legs for three days. Tr. at 330. She denied chest pain and shortness of breath and indicated she was compliant with her blood pressure medication. *Id.* The provider observed pitting edema and diagnosed hypertension and peripheral edema. *Id.*

On June 29, 2011, Holly Hadley, Psy. D., reviewed the evidence in the record and adopted the March 2011 mental rating. Tr. at 331.

An x-ray of Plaintiff's left ankle demonstrated mild spurring on July 18, 2011. Tr. at 334. X-rays of her left knee showed quadratus femoris tendon thickening and Hoffa's fat pad stranding. Tr. at 335. The radiologist suggested that the findings may suggest tendinopathy or internal derangement and that an MRI might be considered. *Id.*

On July 19, 2011, state agency medical consultant William Cain, M.D., completed a physical residual functional capacity evaluation in which he indicated Plaintiff could perform work with the following limitations: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday; occasionally push and pull with the left lower extremity; frequently balance; occasionally climb ramps/stairs and stoop; never climb ladders/ropes/scaffolds, kneel, crouch, or crawl; and frequently reach with the left upper extremity. Tr. at 337–44.

Plaintiff presented to the ED at Roper Hospital on January 28, 2012, with left lower quadrant pain, nausea, and diarrhea. Tr. at 351. She presented to the ED at Roper Hospital again on April 30, 2012, complaining of diffuse abdominal pain. Tr. at 356. She stated that the pain began under her left breast one day earlier. *Id.* The provider noted a history of recurrent diverticulitis. Tr. at 357.

On June 5, 2012, Plaintiff presented to Roper Hospital with wheezing, cough, shortness of breath, and trouble breathing. Tr. at 361. The provider noted that she

continued to smoke. *Id.* Plaintiff was prescribed Albuterol, Prednisone, and Zithromax. Tr. at 362. She returned to Roper Hospital the next day with wheezing, shortness of breath, and persistent cough. Tr. at 366. The provider noted that Plaintiff was diagnosed with bronchitis a day earlier and did not fill her prescriptions. *Id.* Plaintiff's symptoms improved significantly after she received three doses of Albuterol. Tr. at 367. The provider's diagnostic impressions included bronchitis, dyspnea, hypertension, and mild renal insufficiency. *Id.*

Plaintiff was admitted to Roper Hospital from June 9–12, 2012, for community-acquired pneumonia, acute exacerbation of COPD, class 3 obesity, urinary tract infection, and hypertension. Tr. at 369. Scott Davidson, M.D., instructed Plaintiff to cease smoking. *Id.* He observed Plaintiff to have a BMI of 46.2 and recommended a cardiac diet. *Id.*, Tr. at 370.

Plaintiff followed up at FCFFHC on June 21, 2012. Tr. at 391. She complained of shortness of breath and lower back pain. *Id.* Charles Effiong, M.D., noted diffuse wheezes. *Id.* He prescribed Prednisone and instructed Plaintiff to continue to use a nebulizer. *Id.*

C.     The Administrative Proceedings

1.     The Administrative Hearing

a.     Plaintiff's Testimony

At the hearing on July 17, 2012, Plaintiff testified that she had been out of work since she applied for benefits in 2010. Tr. at 30. She indicated she had been unable to work because of arthritis in her legs and back. *Id.* She complained of shortness of breath,

falls, swelling in her ankles and legs, and interrupted sleep. *Id.* Plaintiff testified that COPD caused pain, chest tightness, and wheezing. Tr. at 31. She indicated she took three medications for COPD and used a nebulizer. *Id.* She stated she experienced shortness of breath when she walked and engaged in minimal exertional activities. Tr. at 32–33. Plaintiff testified that she was recently hospitalized for pneumonia. Tr. at 33. She indicated that her breathing problems were worsened by exposure to chemicals, dust, and mold. Tr. at 34. Plaintiff stated she awoke during the night because of lower back pain. *Id.* She also indicated that her back pain was exacerbated by sitting for too long. *Id.* She stated that she experienced swelling in her legs and ankles once a week. Tr. at 35. She indicated she was previously prescribed Lasix for swelling, but her doctor discontinued Lasix because of possible negative interaction with her other medications. *Id.* Plaintiff testified that her doctor told her to elevate her legs and that she elevated them for the majority of the day. *Id.* Plaintiff indicated that she had no side effects from her medications. Tr. at 34.

Plaintiff testified that she lived with her 14-year-old daughter. Tr. at 36. She stated that her daughter did some of the housework. *Id.* She indicated that her sister and her son's girlfriend lived nearby and performed most of the cooking and cleaning. *Id.* Plaintiff testified that she was able to perform some chores, but stopped and started them over a lengthy period. Tr. at 36–37. Plaintiff stated that if she performed a task for thirty minutes, she rested for an hour or two. Tr. at 37. She indicated that she was no longer able to participate in activities she enjoyed, including bowling. Tr. at 37–38.

Plaintiff testified that she did not like having to depend on others to assist her. Tr. at 38. She indicated she lacked insurance was unable to afford all of the medical treatments that she needed. *Id.* She stated that a surgery to repair a bleeding internal hemorrhoid was cancelled because she lacked insurance. *Id.* She indicated that she was unable to obtain a cancer screening because she could not afford it. *Id.*

b.     Vocational Expert Testimony

Vocational Expert ("VE") Silvio Reyes, Ph. D., reviewed the record and testified at the hearing. Tr. at 39–41. The VE categorized Plaintiff's PRW as a housekeeper, *Dictionary of Occupational Titles* ("*DOT*") number 323.687-014, as light in exertional level and unskilled with a specific vocational preparation ("SVP") of two; a dry-cleaner helper, *DOT* number 362.686-010, as medium in exertional level with a SVP of two; and a cashier, *DOT* number 211.462-010, as light in exertional level with a SVP of two. Tr. at 39. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work; could occasionally operate foot controls with her left foot; could not climb ladders, ropes, or scaffolds; could occasionally climb ramps or stairs, stoop, crouch, kneel, and crawl; could frequently reach; should avoid concentrated exposure to extreme cold and heat; and should avoid moderate exposure to irritants such as fumes, odors, dust, and gases. Tr. at 39–40. The VE testified that the hypothetical individual could perform Plaintiff's PRW as a cashier. Tr. at 40. The ALJ asked whether there were any other jobs in the region or national economy that the hypothetical person could perform. *Id.* The VE identified light jobs with an SVP of two that included work as a tag inserter, *DOT* number 222.567-018, with 3,000 jobs in South Carolina and 350,000

jobs nationally; a towel folder, *DOT* number 589.687-014, with 5,500 jobs in South Carolina and 300,000 jobs nationally; and a stamper, *DOT* number 920.687-126, with 700 jobs in South Carolina and 100,000 jobs nationally. *Id.* The ALJ then asked the VE if an individual could perform any jobs if the individual were off task more than an hour per day, in addition to scheduled break times. Tr. at 41. The VE testified that the individual could perform no work. *Id.* The ALJ asked if an individual would be able to perform jobs if she were to miss more than two days of work per month. *Id.* The VE testified that she could not. *Id.*

### 2.    The ALJ's Findings

In his decision dated July 27, 2012, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through March 31, 2010.
2.    The claimant has not engaged in substantial gainful activity since May 19, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.    The claimant has the following severe impairments: chronic obstructive pulmonary disease (COPD), degenerative disc disease, and obesity (20 CFR 404.1520(c) and 416.920(c)).
4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant is limited to occasional foot control operation with the left lower extremity, no climbing of ladders, ropes, or scaffolds, occasional climbing ramps and stairs, occasional stooping, crouching, kneeling and crawling, frequent reaching, and avoiding concentrated exposure to extreme heat and cold and moderate exposure to irritants such as fumes, odors, and gases.

6.    The claimant is capable of performing past relevant work as a cashier. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from May 19, 2010, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

Tr. at 14–22.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ's step two findings were not supported by substantial evidence; and

2)    the ALJ's RFC analysis was not supported by substantial evidence.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series

13

of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See*

*Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Step Two Analysis

Plaintiff argues that the ALJ erred in assessing her impairments at step two of the evaluation process. [ECF No. 15 at 9]. She contends that the ALJ failed to explain his reasons for concluding that her knee impairment was non-severe. *Id.* at 10.

The Commissioner argues that the ALJ's conclusion that Plaintiff's knee pain was not severe was supported by substantial evidence. [ECF No. 17 at 1]. She contends that

"[t]he record supports no suggestion that Plaintiff's knee impairment (as opposed to the physical impairments the ALJ did find severe—degenerative disc disease and obesity) created any significant work-related physical limitations." *Id.* at 9. The Commissioner further maintains that the ALJ considered Plaintiff's left knee pain and restricted motion as part of his RFC assessment and limited her to occasional operation of foot controls with her left leg, no climbing of ladders, ropes, or scaffolds, no climbing of ramps or stairs, and occasional stooping, crouching, kneeling, and crawling. *Id.* at 10.

A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c); *see also* SSR 96-3p. A non-severe impairment "must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, *citing* SSR 85-28; *see also* 20 C.F.R. §§ 404.1521(a), 416.921(a).

Basic work activities include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b), 416.921(b).

The presence of symptoms alone, such as pain, fatigue, shortness of breath, weakness, or nervousness, does not establish the existence of a severe impairment. SSR 96-3p. For an impairment to be severe, the impairment must be established by objective

medical evidence (i.e., signs and laboratory findings) and must reasonably be expected to produce the alleged symptoms. *Id.*; *see also* 20 C.F.R. §§ 404.1508, 416.908.

The ALJ's recognition of a single severe impairment at step two ensures that he will progress to step three. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence."). Therefore, this court has found no reversible error where the ALJ neglected to find an impairment to be severe at step two provided that he considered that impairment in subsequent steps. *See Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (collecting cases); *Singleton v. Astrue*, No. 9:08-1982-CMC, 2009 WL 1942191, at *3 (D.S.C. July 2, 2009).

The ALJ found that Plaintiff's severe impairments included COPD, degenerative disc disease, and obesity. Tr. at 14. He acknowledged that Plaintiff had been diagnosed with "mild spurring of the left knee," but that "there was no evidence" that the condition "required more than conservative measures to be stabilized or that the claimant has suffered any significant work-related functional limitations" as a result of the condition. Tr. at 14–15. The ALJ cited evidence of Plaintiff's knee impairment in summarizing the medical evidence. Tr. at 17 ("claimant had diminished motion of the left knee"). Although the ALJ did not specify in the RFC assessment that he imposed restrictions

based on Plaintiff's left knee impairment, he did limit Plaintiff to occasional foot control operation with the left lower extremity.[3] *See* Tr. at 16.

The undersigned recommends a finding that the ALJ properly assessed Plaintiff's left knee impairment. The evidence supports the presence of impairment to and restricted flexion of the left knee, but does not indicate that Plaintiff's left knee impairment imposed any particular functional limitations. *See* Tr. at 294, 335. Plaintiff argues that because the ALJ found that she was capable of walking and standing two hours per day and performing a variety of postural movements, he did not adequately assess her left knee impairment. [ECF No. 15 at 10]. However, Plaintiff cites no evidence to connect the impairment to these particular restrictions. She did not complain of knee pain or any restrictions resulting from an impairment to her left knee in the function report or in her testimony. Tr. at 30–39, 178–88. She complained to her physicians of left knee pain and reported that her left knee "gives out," but she did not indicate any exacerbating factors. *See* Tr. at 277, 278, 296. In *Washington*, this court found that to the extent the ALJ erred in classifying the plaintiff's impairment as non-severe, she had suffered no harm "because the ALJ accounted for limitations that may have been caused by" the impairment the ALJ found to be non-severe. 698 F.Supp. 2d at 580. Here, although the ALJ indicated that he determined Plaintiff's left knee impairment to be non-severe, he limited Plaintiff to occasional foot control operation with her left lower extremity, which

---

[3] Although the Commissioner argues that the ALJ imposed other restrictions based on Plaintiff's left knee impairment, the only restriction that pertains exclusively to Plaintiff's left knee, as opposed to other severe impairments, is occasional use of the left lower extremity to operate foot controls. *See* ECF No. 17 at 10.

was a limitation based only on impairment to Plaintiff's left knee.[4] *See* Tr. at 14–15, 16. The record does not support the existence of any additional functional limitations as a result of Plaintiff's left knee impairment. Therefore, the undersigned recommends a finding that the ALJ properly considered Plaintiff's left knee impairment in assessing her RFC, rendering harmless any error in failing to assess the impairment as severe at step two.

### 2.    Credibility and RFC Analysis

#### a.    Objective Medical Evidence

Plaintiff maintains that the ALJ impermissibly relied on a lack of objective findings in assessing her credibility. [ECF No. 15 at 12]. The Commissioner maintains that the ALJ properly considered objective medical evidence that failed to corroborate Plaintiff's complaints of musculoskeletal impairments. [ECF No. 17 at 11]. She further argues that Plaintiff's physicians prescribed conservative treatment for her other impairments and that she responded well to that treatment. *Id.*

Once a claimant establishes the presence of an underlying physical or mental impairment that could reasonably be expected to cause the pain or other alleged symptoms, the ALJ cannot disregard the claimant's statements about symptoms solely

---

[4] The ALJ found that Plaintiff's severe impairments included COPD, degenerative disc disease, and obesity. Tr. at 14. None of these impairments imposed any functional limitation on Plaintiff's ability to operate foot controls with her left lower extremity. Dr. Cain, a state agency consultant, indicated in a physical residual functional capacity assessment that Plaintiff was limited to occasional pushing and pulling with her left lower extremity. Tr. at 338. The ALJ indicated that he gave some weight to the opinions of the state agency consultants. Tr. at 19. Therefore, the undersigned concludes that the ALJ considered the impairment to Plaintiff's left knee in imposing this particular restriction.

because they are not substantiated by objective medical evidence. *Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006); *see also* SSR 96-7p. However, objective medical evidence "is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of" the claimant's symptoms and their effect on her ability to function. SSR 96-7p, (*quoting* 20 C.F.R. §§ 404.1529(c)(2) and 416.929(c)(2)). The presence of objective medical findings lends credibility to a claimant's allegations about pain or other symptoms and their functional effects. *Id.* The absence of objective medical evidence to corroborate a claimant's statements "is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence." *Id.* "Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers." *Hines*, 453 F.3d at 565 n.3, *citing Craig v. Chater*, 76 F.3d 585, 595 (4th Cir. 1996).

The ALJ concluded Plaintiff's testimony was "not fully credible concerning the severity of her symptoms and the extent of her limitations" and that "neither the severity nor the extent" was "supported by the objective medical evidence of record." Tr. at 19. The ALJ determined that Plaintiff's allegation of shortness of breath while walking was partially credible based on her morbid obesity, but that the medical evidence did not

show significant pulmonary findings. Tr. at 18. The ALJ also rejected Plaintiff's complaints of disabling musculoskeletal pain and indicated the following:

> The record does not substantiate the claimant's allegations as to the severely restricting nature of her musculoskeletal impairment noting that despite allegations of disabling pain, the evidence fails to reveal that the claimant was ever in any acute distress and examinations were essentially benign. There is no indication that the claimant has required inpatient hospitalization for her degenerative disc disease and in spite of her allegations of disabling pain, she has not sought additional treatment including physical therapy, biofeedback, surgery, or treatment from a pain clinic. The record also reveals that the claimant does not regularly take narcotic pain-relieving medications. This extremely conservative course of treatment is inconsistent with a level of severity that would preclude the claimant from sustaining any work activity.

> The evidence of record fails to reveal any signs of muscular atrophy, strength deficits, circulatory compromise, neurological deficits, muscle spasms, or change in weight, which may be reliable indicators of long-standing, severe or intense pain, and/or physical inactivity.

*Id.* The ALJ also based his credibility determination on an absence of specific restrictions placed on claimant by her treating physicians. Tr. at 19.

The undersigned recommends a finding that the ALJ properly considered the objective medical evidence as one of several factors in his assessment of Plaintiff's credibility. Although an ALJ cannot rely on a lack of objective medical evidence alone to conclude that a claimant's statements lack credibility, 20 C.F.R. §§ 404.1529(c)(2) and 416.929(c)(2) and SSR 96-7p indicate that the ALJ should consider the objective medical evidence in the context of the entire record. Here, the ALJ considered the objective medical evidence, but concluded that it did not support the disabling level of pain Plaintiff alleged. Tr. at 18–19. He based his conclusion on the examining physicians' descriptions of normal examinations and Plaintiff being in no acute distress. Tr. at 19. He

referenced a lack of evidence to suggest Plaintiff had suffered from long-term pain and cited her conservative treatment. *Id.* If the ALJ had provided no more support for his credibility determination, it might have been insufficient. However, the ALJ did not stop with a discussion of the objective evidence. He also examined multiple additional factors, including Plaintiff's noncompliance with prescribed treatment, her daily activities, and her work activity. *See* Tr. at 18–20. Therefore, the undersigned recommends a finding that the ALJ did not disregard Plaintiff's symptoms solely because they were not substantiated by objective medical evidence. He merely relied on a lack of support for Plaintiff's allegations in the medical records as one of several factors to assess her credibility.

b.    Noncompliance with Medical Treatment

Plaintiff argues that the ALJ erroneously discounted her credibility based on her failure to pursue medical treatment without considering her reasons for failing to do so. *Id.* The Commissioner maintains that the ALJ did not base his credibility determination on a lack of evidence of treatment, but rather based it on the specific findings of Plaintiff's medical providers. [ECF No. 17 at 13].

To obtain benefits, a claimant must follow all prescribed treatment that can restore her ability to work and failure to follow prescribed treatment without good cause will result in a finding that the claimant is not disabled. 20 C.F.R. §§ 404.1530(a),(b), 416.930(a),(b). "[T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed

and there are no good reasons for this failure." SSR 96-7p. The ALJ is prohibited from drawing negative inferences about the claimant's credibility without considering her explanations as to her reasons for noncompliance and other evidence in the record that may explain infrequent or irregular medical visits or failure to seek medical treatment.[5] *Id.* If an ALJ bases a decision to deny benefits to a claimant on the claimant's medical noncompliance, the ALJ must make a particularized inquiry and the burden of producing evidence concerning unjustified noncompliance lies with the agency. *Preston v. Heckler*, 769 F.2d 988, 990 (4th Cir. 1985). The ALJ must establish by substantial evidence that the claimant's impairment "is reasonably remediable by the particular individual involved, given . . . her social and psychological situation" and that the claimant lacks good cause for failing to follow prescribed treatment. *Id.*, *citing Tome v. Schweiker*, 724 F.2d 711, 714 (8th Cir. 1984), *Gordon*, 725 F.2d at 236. An ALJ cannot deny a claimant benefits based on the claimant's failure to obtain treatment she cannot afford. *Gordon v. Schweiker*, 725 F.2d 231, 237 (4th Cir. 1984).

The ALJ indicated "[t]he claimant's credibility is diminished by her history of treatment medication non-compliance." Tr. at 18. The ALJ referenced ED records from June 2012 that indicated Plaintiff was out of hypertension medication and neglected to

---

[5] Some explanations that may provide insight into the claimant's credibility include the following: that the claimant has structured her daily activities so as to minimize symptoms, that the claimant's symptoms are relieved with over-the-counter medications, that the claimant avoids taking medications because of the side effects, that the claimant is unable to afford treatment and lacks access to free or low-cost services, that the individual has been advised by medical sources that no further effective treatment can be undertaken, and that medical treatment is contrary to the teaching and tenants of the claimant's religion. SSR 96-7p.

fill prescriptions for Prednisone and Azithromycin. *Id.* The ALJ also found that "detracting from the claimant's credibility is the fact that she continues to smoke notwithstanding her respiratory issues." *Id.* The ALJ further wrote "[t]he claimant alleged a lack of treatment because she has no health insurance and cannot afford it; however, there are agencies, such as county health departments, that supply medical services and/or medication on a low cost or no cost basis." *Id.*

The undersigned recommends a finding that the ALJ properly considered Plaintiff's noncompliance with treatment recommendations. Aside from Plaintiff's alleged financial difficulties in obtaining treatment, the record does not suggest any social or psychological factors that contributed to her noncompliance. The ALJ determined Plaintiff lacked good cause for failing to follow prescribed treatment after considering whether her impairment was easily remediable and whether she had financial difficulty in obtaining treatment. The ALJ addressed Plaintiff's noncompliance in the context of her hospitalization for pneumonia and COPD. *See* Tr. at 18. The records from Roper Hospital indicate that Plaintiff neglected to fill medications prescribed for bronchitis, which caused her to develop pneumonia and temporarily exacerbated her COPD symptoms. Tr. at 366, 369, 371–72. Therefore, the ALJ reasonably concluded that Plaintiff's pneumonia and COPD exacerbation were easily remediable. The ALJ also considered whether Plaintiff demonstrated good cause for her failure to follow prescribed treatment and concluded that, despite her allegations that she did not have insurance and could not afford treatment, Plaintiff failed to avail herself of opportunities to obtain her medications from low or no-cost services and continued to smoke cigarettes. *Id.* Plaintiff argues that

25

she obtained treatment from a low-cost facility, but that they were unable to meet all of her needs. [ECF No. 15 at 13]. She testified that she had problems obtaining medical procedures and tests, but did not allege she was unable to obtain her medications. Tr. at 38. In the absence of evidence to suggest Plaintiff attempted to obtain the prescribed medications and in light of the fact that she incurred the financial burden associated with continued tobacco abuse, the undersigned recommends a finding that the ALJ reasonably concluded that Plaintiff did not show good cause for her failure to obtain the prescribed medications.

Furthermore, the undersigned recommends a finding that the ALJ's discussion of Plaintiff's noncompliance was limited to the context of Plaintiff's COPD exacerbation and pneumonia diagnosis and was used to support his conclusion that the COPD exacerbation was preventable and uncharacteristic of Plaintiff's general level of impairment. *See* Tr. at 18. The ALJ did not discount all of Plaintiff's subjective complaints based on noncompliance and he did not penalize Plaintiff for a failure to obtain treatment she could not afford. Although the ALJ cited Plaintiff's lack of hospitalizations, surgery, biofeedback, physical therapy, pain management, and narcotic pain medications, he did so to support his conclusion that Plaintiff had not required these treatments—not to suggest that she had failed to pursue them where they were required or would have remedied her impairment. Therefore, the undersigned finds that the ALJ's consideration of Plaintiff's noncompliance with medical treatment was appropriate in the limited context in which he considered it.

c.      Daily Activities

Plaintiff argues that the ALJ mischaracterized evidence regarding her ADLs to support his credibility determination. *Id.* at 13–14. The Commissioner contends that the ALJ accurately described Plaintiff's ADLs and that his conclusion that Plaintiff's ADLs supported greater functional abilities than she alleged was supported by the record. [ECF No. 17 at 13].

Daily activities are among the factors that ALJs should consider in assessing a claimant's credibility. 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i); SSR 96-7p.

The ALJ considered Plaintiff's daily activities as part of the credibility assessment, indicating the following:

> [S]he was able to care for her personal hygiene and needs independently, do household chores, prepare simple meals (sandwiches and microwavable foods), drive, shop for food and household items, manage her finances (pay bills, count change, handle a savings account, and use checkbook and money orders), and attend church regularly. These activities are not limited to the extent one would expect, given her complaints of disabling symptoms and limitations.

Tr. at 19. The ALJ recognized that "the claimant's ability to perform some physical tasks (at her own pace and in her own manner)" was insufficient to establish her ability to engage in substantial gainful activity, but found that Plaintiff's activities "rise above the ability to work only a few hours a day or to work only on an intermittent basis and indicate functional abilities substantially greater than those alleged." *Id.* The ALJ also referred to evidence that suggested Plaintiff worked after her alleged onset date of disability. *Id.* He wrote "[a]lthough, that work activity did not constitute disqualifying

27

substantial gainful activity, it does indicate that the claimant's daily activities have, at least at times, been somewhat greater than the claimant has generally reported." *Id.*

In a function report, Plaintiff indicated that she attempted to make her bed, but could not always finishing making it. Tr. at 179. She reported that her daughter helped her "most of the time." *Id.* She wrote that her daughter sometimes helped her to dress and that her sister helped her care for her hair. *Id.* She indicated that she used a cane to walk to the bathroom. *Id.* Plaintiff wrote that she sat at the table to prepare food when she cooked and that she was able to prepare sandwiches and frozen foods. Tr. at 183. She indicated that she grew tired quickly and sometimes could not finish preparing meals. *Id.* She also indicated that she became tired after cleaning for about 20 minutes. *Id.* Plaintiff indicated she left her home to go to doctor's visits, to church weekly, and to the store twice a month. Tr. at 184. She wrote that she was able to drive, but indicated she used a wheelchair when she shopped. *Id.* She endorsed abilities to pay bills, count change, handle a savings account, and use a checkbook or money order. *Id.* She indicated she could only walk 50 feet and would need to rest for 30 minutes thereafter because of shortness of breath. Tr. at 186. She wrote that she could lift nothing heavy. *Id.*

During the hearing, Plaintiff testified that she had not worked since prior to her alleged onset date in 2010. Tr. at 30. She stated that her daughter did some of the housework. *Id.* She indicated that her sister and her son's girlfriend lived nearby and performed most of the cooking and cleaning. *Id.* Plaintiff testified that she was able to perform some chores, but that she had to start and stop over a long period. Tr. at 36–37. She indicated that she could perform a task for thirty minutes, but then needed to rest for

an hour or two. Tr. at 37. She stated she was no longer able to participate in activities she enjoyed, including bowling. Tr. at 37–38.

The undersigned recommends a finding that the ALJ appropriately considered Plaintiff's daily activities in assessing her credibility. The ALJ's description of Plaintiff's ADLs was generally consistent with Plaintiff's own descriptions and any inconsistencies between the two were explained by the ALJ's recognition of Plaintiff's ability to perform activities "at her own pace and in her own manner." *Compare* Tr. at 19, *with* Tr. at 30–38, 179–86. The ALJ found that Plaintiff's daily activities were greater than she alleged based on evidence that she worked in 2010 and 2011. Tr. at 19. The record reflects that Plaintiff earned $9,863.00 in self-employment income in 2010 and $9,283.00 in self-employment income in 2011. Tr. at 135, 142, 145. These were among Plaintiff's highest earning years since she first reported earnings in 1978.[6] These earnings also contradicted Plaintiff's testimony that she had not worked since prior to filing her application in 2010. *See* Tr. at 30. In light of Plaintiff's indications that she retained the ability to perform some activities and based on evidence that suggested she worked during the relevant period, but neglected to mention that work when directly asked when she last worked, the undersigned recommends a finding that the ALJ appropriately concluded that Plaintiff's daily activities suggested greater functional abilities than she alleged.

---

[6] Plaintiff earned $11,906.93 in 1991, $12,587.16 in 1992, and $10,247.39 in 2002. Tr. at 153. With the exception of these years, Plaintiff reported higher earnings in 2010 and 2011 than she reported in any other years between 1978 and 2009.

d.       Credibility Finding and RFC Assessment

Plaintiff argues that the ALJ improperly assessed her RFC because he did not properly assess her credibility. [ECF No. 15 at 11–14]. The Commissioner argues that the ALJ's conclusion that Plaintiff was not entirely credible was supported by the objective medical evidence, Plaintiff's ADLs, and her failure to quit smoking and that his RFC assessment was supported by the evidence. [ECF No. 17 at 11].

RFC is an assessment of the claimant's ability to perform sustained work-related activities eight hours per day, five days per week. SSR 96-8p. The ALJ must identify the limitations imposed by the claimant's impairments and assess her work-related abilities on a function-by-function basis. *Id.* "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.*

To assess a claimant's RFC, the ALJ must determine whether the claimant's statements about the effects of her impairments on her functional ability are credible. *Id.* The ALJ should consider the intensity, persistence, and functionally-limiting effects of the claimant's symptoms to determine the extent to which they affect her ability to do basic work activities. SSR 96-7p. He should also consider the consistency of the claimant's statements both internally and with other information in the case record. *Id.* The ALJ "must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about

the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.*

The ALJ must specify his reasons for the finding on credibility and support it with evidence in the case record. *Id.* The ALJ's decision must clearly indicate the weight accorded to the claimant's statements and the reasons for that weight. *Id.*

The ALJ found that Plaintiff could perform less than the full range of light work and was limited to occasional foot control operation with the left lower extremity, no climbing of ladders, ropes, or scaffolds, occasional climbing of ramps and stairs, occasional stooping, crouching, kneeling and crawling, frequent reaching, and avoiding concentrated exposure to extreme heat and cold and moderate exposure to irritants such as fumes, odors, and gases. Tr. at 15–16.

The undersigned recommends a finding that the ALJ's credibility finding and RFC assessment were supported by substantial evidence. The ALJ considered the entire record in assessing Plaintiff's credibility, but concluded that Plaintiff's statements about the intensity, persistence, and functionally-limiting effects of her symptoms were inconsistent with the record. Tr. at 16–20. The ALJ relied upon the objective medical records, Plaintiff's history of conservative treatment, and her daily activities to conclude that Plaintiff's impairments did not affect her functional abilities to the extent that she alleged. *Id*. The ALJ acknowledged that Plaintiff had severe impairments that included COPD, degenerative disc disease, and obesity and imposed restrictions based upon those impairments. Tr. at 20. Although he determined Plaintiff's left knee impairment to be non-severe at step two, he went on to consider it in limiting Plaintiff to occasional foot

31

operation with the left lower extremity. Tr. at 16. Therefore, the undersigned concludes that the ALJ considered the limitations imposed by Plaintiff's impairments, assessed her work-related abilities on a function-by-function basis, and that his credibility and RFC findings were supported by medical and non-medical evidence in the record.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

March 3, 2015                                Shiva V. Hodges
Columbia, South Carolina                     United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).